# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAJUAN BELL, | Case No. 1:23-cv-01564-JLT-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| MARCUS POLLARD, | |
| Respondent. | |

Petitioner JaJuan Bell is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

Petitioner and his codefendants "were convicted of dozens of crimes relating to a 2007 robbery of the Golden West Casino and its patrons, as well as a conspiracy to rob the casino again in 2008." People v. Bell, 47 Cal. App. 5th 153, 159 (2020) (Bell II). On October 15, 2015, the California Court of Appeal conditionally reversed the judgment and remanded, allowing the prosecution to move to strike the defendants' pleas of once in jeopardy. People v. Bell, 241 Cal. App. 4th 315, 361 (2015) (Bell I). On November 5, 2015, Petitioner filed a petition for review in the California Supreme Court, which denied the petition on January 27, 2016. (LDs[1] 73, 75.)

---

[1] "LD" refers to the documents lodged by Respondent. (ECF No. 13.)

On remand, the prosecution moved to strike the defendants' jeopardy pleas, the trial court granted the motion to strike, and Petitioner was resentenced to an imprisonment term of 73 years and 8 months. Bell II, 47 Cal. App. 5th at 161. On April 1, 2020, the California Court of Appeal affirmed the trial court's order striking the jeopardy pleas and remanded for the trial court "to consider how it would like to exercise the discretion granted by Senate Bill 620 and Senate Bill 1393." Bell II, 47 Cal. App. 5th at 200. On April 22, 2020, Petitioner filed a petition for review in the California Supreme Court, which denied the petition on July 22, 2020. (LDs 98, 99.) On remand, Petitioner was resentenced to an imprisonment term of 63 years and 8 months. People v. Bell, No. F081937, 2022 WL 1261215, at *3 (Cal. Ct. App. Apr. 28, 2022) (Bell III). On April 28, 2022, the California Court of Appeal affirmed the judgment. Id. at *4.

On October 16, 2023, Petitioner filed the instant petition for writ of habeas corpus, asserting that the trial court erred in granting the motion to strike the defendants' plea of once in jeopardy. (ECF No. 1.) On January 30, 2024, Respondent filed an answer. (ECF No. 14.) To date, no traverse has been filed, and the time for doing so has passed.

## II.

## STATEMENT OF FACTS[2]

### I. Overview and Background[3]

During the first trial of this matter in 2010, prosecutor Chad Louie called a last-minute witness named Deputy Bill Starr to testify about defendants' arrest. Louie failed to tell Starr about an in limine order prohibiting prosecution witnesses from testifying about certain aspects of the arrest, such as law enforcement's use of spike strips, the deployment of the SWAT team, and those "kind[s] of thing[s]." Louie asked Starr whether he made "contact" with one of the vehicles defendants were in. He responded, "No. I was positioned in the turret of the armored personnel carrier." The court declared a mistrial.

Defendants entered pleas of once in jeopardy, contending retrial was barred because Louie had intentionally goaded the defendants into requesting a mistrial. (See generally Oregon v. Kennedy (1982) 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416.) Defendants sought a jury trial on their jeopardy pleas. The trial court concluded that because the prosecutor's intent concerned a procedural matter, rather than an issue of guilt or innocence, it was necessarily a question of

---

[2] The Court relies on the California Court of Appeal's April 1, 2020 opinion for this summary of the relevant facts and procedural history. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[3] All statutory references are to the Penal Code unless otherwise stated.

law to be decided by the court. The trial court then found that Louie did not intentionally trigger a mistrial.

Defendants were tried again in 2011 by a different prosecutor named James Simson. The jury convicted[4] defendants on the bulk of the charges against them.[5]

On appeal from that judgment, defendants argued the court erred in rejecting their request for a jury trial on the jeopardy pleas. In a 2015 opinion, we concluded the trial court "employed the wrong standard for determining whether a judge, rather than a jury, could adjudicate defendants' once in jeopardy pleas." (*Bell I*, *supra*, 241 Cal.App.4th at p. 359, 194 Cal.Rptr.3d 93.) The standard was not whether the pleas raised an issue of guilt or innocence, but instead whether the pleas raised an issue of fact or law. "If ... a question of fact is presented, the plea must be submitted to a jury. (§§ 1041, subd. 3–1042.)" (*Ibid*.) We conditionally reversed the judgment and remanded, affording the prosecution the opportunity to move to strike defendants' jeopardy pleas under this standard. (See *People v. Mason* (1962) 200 Cal.App.2d 282, 285, 19 Cal.Rptr. 240 (*Mason*).)

On remand, the prosecution did move to strike defendants' jeopardy pleas. After limited discovery and a hearing at which the court accepted testimony, the court granted the prosecution's motion to strike.

The court denied a *Romero*[6] motion filed by Bell, saying, "I do not believe it is in the interest of justice nor do I believe it is appropriate." The court then

---

[4] Defendants Lynell Travon Lewis (Lewis), Deon Lavell Joseph (Joseph), Jajuan Robert Bell (Bell), and John Fitzgerald Williams (Williams) were each convicted of four counts of second degree robbery (counts 1–4; § 212.5, subd. (c)), six counts of assault with a semiautomatic firearm (counts 5–7, 9–11; § 245, subd. (b)), five counts of assault with an assault weapon (counts 12–14, 16–17; § 245, subd. (a)(3)), two counts of transporting an assault weapon (counts 19, 24; former § 12280, subd. (a)(1); see § 30600), two counts of participating in a criminal street gang (counts 21, 28; § 186.22, subd. (a)), one count of conspiracy to commit assault with a semiautomatic firearm (count 22; § 182, subd. (a)(1)), one count of conspiracy to commit robbery (count 23; § 182, subd. (a)(1)), and one count of carrying a loaded firearm in public by a member of a criminal street gang (count 26; former § 12031, subd. (a)(2)(C)). Defendants Bell and Lewis were additionally convicted of two counts of possessing a firearm as a felon (counts 18 & 27; former § 12021, subd. (a)(1)).

 The jury found all of these crimes were committed for the benefit of, or in association with, a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)) as alleged in the indictment, except the active gang participation counts (counts 21, 28) and the single count of possessing a loaded firearm by an active street gang member (count 26).

 The jury also found that, as to the robbery counts, each defendant was a principal and at least one principal personally used a firearm as alleged in the indictment; except that no verdict form for this enhancement to count 28 (active gang participation) as to Bell was submitted to the jury. (Former § 12022.53, subd. (e)(1).) The jury further found that a principal was armed during the commission of the two conspiracy counts. (Former § 12022, subd. (a).)

 The jury found that Joseph, Lewis and Williams each personally used a firearm during the commission of the six counts of assault with a semiautomatic firearm and the two counts of active participation in a criminal street gang. (Former § 12022.5, subd. (a).) The jury found it "not true" that Bell personally used a firearm during the commission of those crimes.

 The trial court found that the prior convictions alleged against Bell and Lewis were true.

 The court granted a motion for acquittal (§ 1118.1) on counts 8 and 15 (assaults). A charge of vehicle theft (count 20) was dismissed pursuant to a stipulation between counsel. Another charge of vehicle theft (count 25) was dismissed on the court's motion.

[5] A detailed statement of the facts from the second trial is set forth in *Bell I*, which we incorporate by reference. (See *In re Ruedas* (2018) 23 Cal.App.5th 777, 783, 233 Cal.Rptr.3d 555.)

[6] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 (*Romero*).

resentenced Bell to a total term of 73 years eight months; Williams to a total term of 54 years four months; Lewis to a total term of 59 years four months; and Joseph to a total term of 47 years eight months.

## II. 2010 Proceedings

### *In Limine Ruling Regarding Circumstances of Defendants' Arrest*

At a hearing on October 20, 2010, before defendants' first trial, the court and parties discussed several in limine motions. The court's ruling on motion in limine "number nine" is central to the issues on appeal, so we set forth the ruling and preceding discussion in full:

> "THE COURT: [¶] All right. [Motion in limine n]umber nine is interesting. Number nine, objection to prosecution offering any irrelevant and prejudicial evidence that the sheriff's office and the SWAT gang suppression unit were deployed in March of '08 to arrest the defendants and other prejudicial comments as to the nature of the arrest. [¶] So, apparently, when the defendants were on their way to Kern County, for what the prosecution feels is to do another robbery, the S.O., for lack of a better term, was laying for them out on Highway 58 and spike stripped them, and then felony stop and SWAT team and the whole bit. Is that right?

> "MR. LOUIE [PROSECUTOR]: Correct.

> "THE COURT: All right. What – what do you have?

> "MR. GAGLIARDINI: That's a very –

> "THE COURT: Minimalist version?

> "MR. GAGLIARDINI: Yes, Judge.

> "THE COURT: Okay. Mr. Louie, what – what do you – what's your plans on getting into all that? What's your thoughts? What were you planning on doing on direct?

> "MR. LOUIE: On direct I intend to have multiple KCSO deputies come and testify about the circumstances of the stop that they did on the defendants and get into detail on what they did, and why they did it, and then what they found when he searched the vehicle, so that the jury understands and it's relevant to what the conspiracy was that the defendants were trying to do.

> "THE COURT: Okay. [¶] So enlighten me what is it that's going to be elicited?

> "MR. LOUIE: What will be elicited is that there was surveillance that was done on the defendants and vehicles at a residence in the Palmdale/Lancaster area. A senior deputy went to a store, followed them, watch [*sic*] them purchase certain items that include gloves – including gloves. Officers then in unmarked cars from that area followed the defendants as they were driving in tandem to Bakersfield. And in Kern County, near Towerline Road, a high-risk stop was initiated with the help

4

of the SWAT team and other Kern County Sheriff's patrol cars and sheriff's deputies. The spike strip was laid out. The cars were disabled, and then contact was made with the defendants inside of those vehicles. The cars were searched, firearms were found, consistent with a conspiracy to commit a robbery. Cell phones were found. Things of that nature.

"THE COURT: And according to what I read here from Mr. Rogers, why is it important that you get in about the SWAT team and the – all that kind of stuff? [¶] Can't we just say that they were – they were stopped in Kern County at Towerline Road and the following was located? Can we do that? Or why do we need to get into –

"MR. LOUIE: We don't – I understand – the Court's concern and defense counsel's concern. I don't necessarily need to get in that it was the SWAT team, that it was laid – that laid out the spike strip. I could sanitize that. Have deputies only talk about the stopped vehicle; that there were multiple officers there on scene that made contact with different individuals. [¶] And, obviously, I have to have their direct testimony come in on what they did, what they found. [¶] So we're not going to get away from the fact that there were a lot of deputies there, but I think we could probably get away from not referring to the SWAT team as being there, not referring to it being a high-risk stop in using the spike strip.

"THE COURT: Okay. [¶] Well, reading this – you know, defense counsel – I'll hear their comments. They made it sound, you know, we've got a C130 overhead, Specter, and, you know, we've got a situation. [¶] Mr. Bowman, I'll hear your comments, sir.

"MR. BOWMAN: No. I think he laid it out. I mean, they talk about surveillance, talk about officers were involved, but there's no need for high-risk stop, no need for spike strips. And that's all we're asking. That stuff is prejudicial. Surveillance, fine. That's – that's fair.

"THE COURT: Mr. Lukehart.

"MR. LUKEHART: I'll defer to counsel, but this does raise one other issue that I intended to raise at some point, which is one of these officers walks in here in full tactical gear, with a vest with SWAT all over it and stuff like that, which I have seen more than once, I mean, everybody is sort of laughing at that thought, but I've seen them more than once, I, for one, will be hitting the roof as soon as they walk through the door. So that's a concern.

"THE COURT: You don't want them to come in with their camouflage and a –

"MR. LUKEHART: It does seem –

"THE COURT: -- the raid gear?

"MR. LUKEHART: It does seem to have a deleterious effect on everybody's ability to concentrate on what they actually say.

"THE COURT: All right. Mr. Lukehart, for the – for the record, that's a valid observation, Counsel. [¶] Mr. Rogers.

"MR. ROGERS: The only thing I would add, Judge, is it came through at the grand jury very clearly to me, which is why I wrote this motion, is that I am also anticipating the People to be – if this motion was not granted, to be talking about not only the SWAT team there, but the gang suppression unit, guns a blazing, as well. I would just add part of – I think it's in the objection, but just to bring the Court my concern.

"THE COURT: All right. Mr. Gagliardini?

"Mr. GAGLIARDINI: I'm not going to go over everything everybody said already. But in addition, what is your occupation? Well, I'm a deputy sheriff for Kern County. [¶] What is your current occupation and assignment? I'm assigned to patrol in East Bakersfield. [¶] What was your assignment back on March, in 2008, when the traffic stop occurred on Highway 58? Well, I was a sharpshooter on the SWAT team. [¶] I mean, there's a lot of different ways that the Deputy District Attorney could craft questions to move around what I'm hearing the Court's intent to be, and that is at this point get to the fact you did surveillance; where did you do it; what you see; where was the stop; what did you find; and were these guys in the car, and move on.

"THE COURT: Mr. Louie, you've run into experienced defense counsel here.

"MR. LOUIE: I've got to be able to – I need to be able to put on my case.

"THE COURT: I realize that, Counsel.

"MR. LOUIE: I need to – these are law enforcement officers. Everyone – everyone knows we have a SWAT team. People know that. You know, the jury is going to see the photographs of the stopped car with a bunch of firearms in the back.

"THE COURT: Nobody is disputing that, Counsel. I'm just saying that the Court is fairly amused at the fact that defense counsel has – has anticipated your possible chess moves on this particular area quite adeptly. And it has drawn a smile to the Court's face, for what it's worth.

"MR. LOUIE: Let me –

"THE COURT: But –

"MR. LOUIE: Can I make a couple of comments?

"THE COURT: Of course.

"MR. LOUIE: I expect – and I don't expect defense counsel to object to photographs – the photographs are coming in, as long as I lay the proper foundation of the vehicle – of one of the vehicles that was stopped in the attempted robbery when they come back in March. [¶] And one of those photographs is going to show several firearms in the back, some shotguns, an assault weapon, and a handgun. [¶] Now, the jury hearing that there were a lot of people who were doing surveillance that are associated with Kern County Sheriff's Department, I mean, that's what we would expect.

6

That's not something that is going to be substantially more prejudicial than probative to – to the jury on how this thing happened. And I'm putting on – I need to put on my case. I have a burden and I think I should be able to explain to them the circumstances of this conspiracy.

"THE COURT: All right.

"MR. GAGLIARDINI: Could I respond briefly, Your Honor?

"THE COURT: Certainly.

"MR. GAGLIARDINI: Having the benefit of a wonderful device here called a computer, I just looked at all the photographs of the white Chrysler Pacifica during that traffic stop. And unless I'm missing some photographs, it consists of a white Pacifica at the side of the road with trunk lid open and, quite frankly, only one law enforcement vehicle visible in any of the photographs. [¶] I understand Mr. Louie needs to present evidence for the purposes of relevance as it relates to the elements of the offense. But no element of the offense includes scaring the hell out of the jurors by telling them the SWAT team was there. [¶] And – and I resent – the implication that somehow because he needs to put on his case and it extends to everything that may have or could have happened on 58 that night. It just clearly doesn't. Doesn't apply to everything that happened. He can put on his case, show the pictures that we've seen, and not mention the SWAT team at all. Or spike strips or cops having automatic weapons or inferring to them that – or even implying to them it might be helpful if you showed up in your raid gear to testify.

"THE COURT: Submit it, Counsel?

"MR. GAGLIARDINI: Yes, sir.

"MR. LOUIE: Submit it.

"THE COURT: Mr. Louie, as to the question of – obviously, your officers can testify as to their occupation. Your thoughts on counsel stating that, okay, I was employed by the Kern County Sheriff's Department. And what was your assignment at that date? I was a member of the SWAT team. How is that particularly relevant to the stop?

"MR. LOUIE: It's credibility. It goes to the credibility of the witness. Their occupation goes to their credibility, as well.

"THE COURT: Their occupation, correct?

"MR. LOUIE: Right.

"THE COURT: How about their assignment?

"MR. LOUIE: That's – it's part of their occupation. I – I work – deputy sheriff gets up on the stand. I work for the Kern County Sheriff's Department for X amount of years, and on that date I was assigned to the gang unit. Have to be able to identify these people and tell the jury what they do and what they did.

1

"THE COURT: You mean the four defendants or your witnesses?

2

"MR. LOUIE: My witnesses. That the jury needs to be able to determine

3

the credibility of the witnesses. Part of that is going to be on how they testify. They're going to look at what they do. How they articulate

4

themselves. I mean, all of this stuff is – is important to a witness' testimony.

5

"THE COURT: All right. As to motion in limine number nine, all the activities leading up to the stop, what was seen in Lancaster and going to

6

the store and watching them buy the equipment for the robbery, I take it that's what that is, et cetera, that's all, obviously, allowed as purposes in

7

furtherance and conduct of the conspiracy. [¶] When they get to Towerline Road and what happens there, I think we need to clean it up a little bit. [¶]

8

So as far as how the vehicles were disabled and stopped, we'll need to sanitize that, Mr. Louie, to the fact that at Towerline Road, a – something

9

to the effect that a felony stop was enforced on the two vehicles. [¶] [¶] I think if we get into the fact, it's just – I see it as more prejudicial than

10

probative that we've got the SWAT team out there with automatic weapons and strips, and, you know, the whole crew out there to pull them

11

over. Granted, that's what happened, but I think that it might be more prejudicial than probative. And I don't see any real harm in saying that at

12

Towerline Road a felony stop was made and the cars were stopped and contact was made with the occupants. Here was [*sic*] the occupants.

13

Here's where – the vehicles they were in, and this is what was found inside the vehicles. [¶] So we'll do it that way. I don't want to hear

14

anything about strips or SWAT teams and tactical diversions and all that kind of thing. [¶] The other question is about your officers coming in

15

possibly wearing their raid gear with an M4 slung over their shoulder. We don't need that, either. I think it would be appropriate that the officers

16

coming in be in standard sheriff's department uniform as we see with our bailiffs. Or in business attire. [¶] Lastly, regarding your officers testifying

17

as to their occupation, clearly they testify as to what their occupation is. As to the assignment, that's a close call in my case. But I'm thinking back

18

to many of the other trials we've done in here, and I've never limited an officer testifying as to what his assignment was under any circumstances. I

19

think that it is knowledge or information that the jury should have that on this particular date and time, I was a Kern County Sheriff's Deputy

20

assigned to a particular unit, and this is what I was doing at that location. [¶] And, of course, what he was doing at that location is sanitized to what

21

the Court's discussed. [¶] I do think it is more probative than prejudicial to have the jury know what the officer did and why they were doing it there

22

and what their occupation and assignment was. [¶] But, again, I feel that is a close call, but it is something the Court will allow. [¶] Mr. Louie, am I

23

clear with you on how we're going to proceed at the scene of the stop on Towerline?

24

"MR. LOUIE: You are."

25

***Additional Motions in Limine***

26

Also, on October 20, 2010, the court and counsel discussed a defense request for

27

an order precluding the prosecution from offering at trial any hearsay statements made by one Tameka Turner. The court asked who Turner was and what she

28

would testify about. Louie explained:

> "Tameka Turner is – had a relationship with Mr. Bell. And she resided in the Palmdale, Lancaster area. She is an individual who contacted law enforcement. Law enforcement went to her residence and she turned over a bag of items. Items which the prosecution will use to show that those items were used in the [Golden West casino] robbery on September 13th."

The prosecutor said he was planning to call Turner as a witness and would only use hearsay statements she made to police officers if needed to impeach her trial testimony. The court reminded defense counsel they could cross-examine Turner at trial. If, however, Turner did not testify, and the prosecution tried to offer her hearsay statements to officers at trial, then the defense would "probably have some excellent hearsay objections there."

Bell's trial counsel then asked that the prosecutor be prohibited from mentioning any of Turner's hearsay statements during his opening statement. The court denied the defense request. Bell's trial counsel responded that if Louie did mention the statements during his opening argument and Turner subsequently failed to testify, he would probably move for a mistrial.

Later, the parties discussed a separate, unrelated motion in limine. Defense counsel expressed concern that a prosecution witness was not going to be advised about an in limine ruling. The court replied, "Mr. Louie has been in this court more than any other attorney in the last 12 months, and I found him to be a man of his word in motions in limine."

### Hearing on Request for Bench Warrant for Tameka Turner

Jury selection began on October 25, 2010. On the morning of October 28, Louie requested a bench warrant be issued for Turner. At the hearing on that request, the court received testimony from Trent Sproles, an investigator with the district attorney's office. Sproles testified that he personally served Turner with a subpoena on September 21, 2010, directing her to appear at trial.[7] However, the last telephone contact Sproles had with Turner was on October 14, 2010.[8] On October 25, Sproles contacted Turner's mother, and Turner's daughter's school in an attempt to contact Turner. He also went to her residence and place of work on October 25 and 26, to no avail.

The court asked Louie for an offer of proof as to how Turner's testimony was relevant to the case. Louie responded:

> "Oh. Miss Turner is a material witness in the People's case. She is the – or had a relationship with [defendant] Mr. Bell. She resided at [a residence on] Windsor Place in Palmdale. That was the staging location of the first robbery, as well as the attempted second robbery in March.
>
> "I would expect her to testify that Mr. Bell and several other individuals were at her house on September 12th and September 13th, right before the robbery. She can identify the car that was used in the robbery.

---

[7] At the time, Turner was in the California Witness Relocation Program.

[8] As of October 21, 2010, Turner had not been offered immunity for her testimony against defendants. Considering that she apparently lost contact with the district attorney's office before then, it appears she was never offered immunity ahead of the first trial. The record is clear that she did testify under a grant of immunity at the second trial.

> "After the defendant and other individuals went back to her house after the robbery, she was in her bedroom. She heard individuals counting money. Mr. Bell went in, gave her some money, and then gave her the items that were from the robbery. Money bags, money wrappers, clothing that was used, as well as clothes and a firearm from the robbery."

The court eventually granted Louie's request for a bench warrant. The court and parties then resumed voir dire of the jury. The jury was sworn on the afternoon of October 28.

### Proceedings on November 1, 2010

On the morning of November 1, 2010, outside the presence of the jury, defense counsel reiterated concerns about what Louie might say about Turner during opening argument. Joseph's counsel, Fred Gagliardini, represented that it was his understanding "from the short chambers conference that we had" that Louie did not know Turner's location. Williams's counsel, Michael Lukehart, said, "[I]t's my opinion that the prosecutor is now sufficiently on notice regarding these issues that if a mistrial should occur, there will be certainly issues raised as to the jeopardy issue should we be seeking a mistrial as to this colloquy." The court concluded that Louie could tell the jury, during his opening statement, "what he feels the evidence is going to be ... and he has a good faith belief that that evidence is going to be presented." Louie did not mention Turner in his opening argument.

Later, on November 1, 2010, after trial witnesses had begun to testify, the court had a discussion with counsel outside the presence of the jury. Lewis's counsel, T. Alana Rogers, requested an Evidence Code section 402 hearing, because he had "some objections before the foundation is laid for the bag."[9] Former Sheriff's Deputy Bret Lackey testified at the Evidence Code section 402 hearing that he responded to the Palmdale residence. In one of the bedrooms, Lackey located several items in and near a bag. The items included an SKS rifle, clothing, money wrappers, and gloves.

The court ruled that Lackey could testify before the jury that he found certain items at the Palmdale residence. In the course of stating its ruling, the court observed, "I do believe that Miss Turner is not going to testify."

On direct examination before the jury, Lackey testified about the items he recovered at the Palmdale residence. Louie did not elicit Turner's hearsay statements from Lackey. However, on cross-examination Gagliardini did ask Lackey about a "woman" calling to say she knew who robbed the casino and who

---

[9] At the second trial, Turner testified under a grant of immunity that after the 2007 casino robbery, Bell gave her a bag and told her to dispose of it. Turner did not move the bag for two days, then moved it into the garage. Over a month later, Turner emptied the contents of the bag and contacted law enforcement. A responding deputy observed a pile of items on the floor with half of the items in the bag, and the other half of the items in a pile on the ground near the bag. Among the items were the following: several money bags identical to those used by Golden West Casino; cash wrappers dated "9/12/07" that had been ripped; one of the casino robbery victim's corporate cell phone; several items of clothing, including a black shirt tied into a knot; 7.62-caliber ammunition capable of being fired by either an SKS rifle or AK-47; and pants with black Nike gloves in the back pocket. One of the cash wrappers had a fingerprint that matched Bell's right middle finger.

showed Lackey where certain evidence was located in the Palmdale residence.[10] Lackey identified a photograph (court exhibit No. 1) of the woman. Turner's mother later identified the photograph as depicting Turner. She further identified Turner as Bell's "on-and-off" girlfriend for eight and a half years.

### Proceedings on November 4, 2010

In proceedings outside the presence of the jury, counsel for Lewis was concerned that Investigator Sproles would testify about extraneous matters. Therefore, Lewis's counsel proposed a stipulation instead of testimony. However, Bell's counsel, K. Marshall Bowman, declined to stipulate because he was "hopeful" that Sproles would "go astray" during his testimony. Bowman planned to move for a mistrial if Sproles's testimony violated the court's orders.

Later, Louie informed the court that he had originally planned to call a Deputy Derek Brannan to testify about observing Williams and Michael Johnson exiting the Camry. However, the prosecutor had learned that Brannan had not personally observed that event. Rather, a Deputy Bill Starr had observed the event. Consequently, the prosecutor asked that Starr be added to the witness list so that he could elicit direct observations rather than hearsay. The court asked if defense counsel had any objection to adding Starr to the witness list. No attorney objected.

Louie called district attorney investigator Sproles to testify before the jury. Sproles identified the person depicted in court exhibit No. 1 as Tameka Turner. Defense counsel objected on hearsay grounds, which the court sustained. Defense counsel then moved to strike the testimony about court exhibit No. 1, which the court granted.

Outside the presence of the jury, defendants requested the court strike the entirety of Investigator Sproles's testimony. The court denied the request, but then addressed Louie, saying:

> "[T]here's many times when we have a witness up here, both the prosecution and the defense have come very close to skirting or going over the line on previous rulings. [¶] Many times I'm on the edge of my seat because I think that one of the five of you is going to go over that. [¶] You – your previously discussed the in limine rulings with your witness. And make sure that they understand what can and cannot be testified to in court."

Rogers then told the court that the prosecutor's designated investigating officer, Sergeant Pratt, had been discussing the case with other "sheriff witnesses." Pratt was brought in to testify outside the presence of the jury and explained that he had spoken with witnesses to "prep[ ]" them but was not relaying the testimony of other witnesses to them. Pratt informed Deputy Starr that he was being called to testify about the traffic stop and what Starr "did there." The court found no "problem" with what Pratt had done.

The court asked Louie what Deputy Starr was going to testify about. Louie replied:

> "Starr is – Starr was in the SWAT vehicle – it's my understanding Starr was in the SWAT vehicle that was being led by Derek Brannan, who was

---

[10] The other three defendants objected to this line of questioning, and the court overruled those objections.

> on the witness list. Derek Brannan was in charge of that particular vehicle.
> [¶] That vehicle took down the blue Camry. Starr is going to say he
> observed two black males exit that blue Camry, and that those two black
> males were turned over to sheriff's deputies at the scene."

Shortly thereafter, Deputy Starr was called as a witness and testified before the
jury, in pertinent part, as follows:

> "Q. [Louie:] Can you describe the vehicle that you saw on that date and
> that time, at that location?
>
> "A. [Starr:] It was a dark blue Toyota Camry.
>
> "Q. And did you see any occupants of that vehicle?
>
> "A. Yeah.
>
> "Q. Did you see the occupants exit that vehicle?
>
> "A. I recall at least two occupants. I don't recall if there was [sic] more.
>
> "Q. At least two of the occupants exited?
>
> "A. Yes.
>
> "Q. Can you describe the occupants for us?
>
> "A. The only thing I recall is they were black male adults.
>
> "Q. Do you remember where they exited from?
>
> "A. No, I don't.
>
> "Q. Did you make – did you end up making contact with that vehicle?
>
> "A. No. I was positioned in the turret of the armored personnel carrier."

Gagliardini immediately moved for a mistrial based on the in limine ruling. The
trial judge and all counsel had a chambers conference, which was not transcribed.
The parties went back on the record outside the presence of the jury, and the court
indicated it was leaning towards granting a mistrial. The court observed that
Deputy Starr's testimony violated the court's in limine order "to say the least."
Louie responded first by acknowledging that he had "fail[ed]" to inform the
witness of the in limine ruling. Louie observed that Starr was a "last-minute
witness," though he accepted that was "not an excuse." Louie opposed a mistrial,
arguing that Starr never said "SWAT," "high-risk stop," or "spike strips" which
were the terms discussed in connection with the in limine motion. Louie also
emphasized that evidence about defendants' dangerousness had already been
admitted, including: that an AK-47, two loaded shotguns, a loaded nine-
millimeter semiautomatic were found in the back of the Pacifica, and a
surveillance team of six to eight undercover sheriff's deputies tracked defendants
from Palmdale to Towerline Road.

Gagliardini responded by saying that Louie had admitted during the chambers conference he "failed completely to advise this witness" of the court's in limine ruling. Other defense counsel joined in Gagliardini's request for a mistrial.

Louie said, "[I]f the Court wants to sanction me for not advising this last-minute witness, that's fine. But to grant a mistrial, I'm not sure that the jury was prejudiced ... by that statement." Judge Brownlee said Louie made a "very good point" about the evidence of loaded weapons in the Pacifica but concluded that no admonition to the jury would be sufficient. Judge Brownlee then granted the defense-requested mistrial.

## III. The Jeopardy Pleas

After the mistrial was declared, defendants entered additional pleas of once in jeopardy.

Each defendant requested in writing for the issue to be resolved by way of a jury trial. Joseph also moved, in the alternative, to dismiss the indictment. The prosecution opposed these requests.

A hearing was held on the defense requests before Judge Brownlee, who had presided over the mistrial. Judge Brownlee concluded that because the question of the prosecutor's intent concerned a procedural matter (i.e., double jeopardy) rather than an issue of guilt or innocence, it was a question of law to be decided by the court.

Judge Brownlee observed that "Mr. Louie had been in my court several times prior to this trial on general felony-type cases. Did a competent job on those cases. Those cases were not complicated and straightforward." He also observed that "Mr. Louie was overmatched against the four lawyers for the defense and needed additional assistance from his office. Though none was forthcoming. Nonetheless, he did the best he could." Judge Brownlee also noted his belief that if the first trial had gone to jury, there was no reasonable prospect of acquittal. In a similar vein, Judge Brownlee observed that Louie was "not losing" at the time of the mistrial. Additionally, Judge Brownlee observed that "[Deputy] Starr provided [the offending] testimony not in response to a direct question, but offered it up on his own." Judge Brownlee said there was "no question in my mind that it was not an intentional act done for triggering a mistrial." The court then denied the defendants' motions to dismiss.

Defendants challenged the trial court's ruling in a writ petition to this court. This court denied the writ petition summarily. After the writ petition was denied, all defendants renewed their objection in the trial court as to proceeding without a jury trial on the once in jeopardy plea. A retrial was conducted on the crimes charged, and a jury convicted defendants of nearly all counts and enhancements alleged.

As noted above, we concluded in a 2015 opinion that the trial court used the wrong standard in evaluating whether defendants were entitled to a jury trial on their jeopardy pleas. While the trial court relied on a distinction between matters relating to guilt versus "procedural" matters, we held the proper question was whether the evidence concerning defendants' pleas is undisputed and reasonably gives rise to only one inference (i.e., whether the pleas present solely an issue of law). (*Bell I*, *supra*, 241 Cal.App.4th at p. 359, 194 Cal.Rptr.3d 93.) We

remanded for the court to consider whether to strike defendants' pleas under the proper standard. (*Id.* at pp. 360–361, 194 Cal.Rptr.3d 93.)

**IV. Proceedings on People's Motion To Strike**

On remand, the prosecution moved to strike defendants' jeopardy pleas. All parties filed briefs.

***Investigator Sproles***

Defendants argued to the court that the testimony of Investigator Sproles would help them establish how important Turner was to the prosecution's case. The court concluded it did not need to hear from Sproles. The court said it was well aware that Turner "was a critical witness." The court also described her as "clearly the witness that was the one that, for lack of a better term, broke the case open for law enforcement."

***Discovery***

On July 25, 2016, Bell's new counsel, Richard Rivera, filed a motion for prehearing discovery. The motion requested eight categories of "items," including, for example, "all notes, memoranda, reports or other documents from DDA Louie to his supervisors, or from his supervisors to him, regarding the events leading up to the 2010 mistrial." The prosecutor agreed to provide certain requested documents. The court directed the prosecutor to provide documentation of any communication between Louie and any investigator relating to the efforts to locate Turner after she left the witness protection program. The court also ordered discovery of any documents regarding Louie's advisements to witnesses about pretrial rulings.[11]

The court expressly declined to require the prosecution produce communications between Louie and other attorneys in the district attorney's office. However, the prosecutor later referenced e-mails between Louie and a supervisor. The prosecutor gave one example of an e-mail where Louie's supervisor asked him whether he had filed motions in limine. The court directed the prosecutor to provide that category of e-mails under seal. The court also directed the prosecutor disclose, if any, e-mails from Louie to Simson to the effect of "I got us more time" or anything "along those lines."[12]

The court further required discovery as to communication with investigators and witnesses who were members of law enforcement, laboratory witnesses, and "technical witnesses." The prosecutor responded that there were e-mails concerning when a witness needed to appear in court. The court said that e-mails pertaining solely to when a witness was to appear in court could be summarized. But anything "substantive" would need to be submitted under seal and reviewed by the court in camera.[13]

---

[11] Though the court noted that it appeared from the prosecutor's statements that there were no such documents.

[12] There is no indication in the record that any such e-mails actually exist.

[13] Such documents were submitted to the trial court under seal. We have reviewed these documents as requested by defendants and acquiesced to by the Attorney General. We conclude the trial court did not err in its ruling on the sealed documents.

1    ***Hearing on Motion To Strike***

2    A hearing on the prosecution's motion to strike was held before Judge Charles
     Brehmer, who had also presided over defendants' second trial. James Simson,
3    who had prosecuted defendants at the second trial, represented the People.

4    Rogers called Lukehart as a witness. Lukehart testified that he had a conversation
     with Louie before Deputy Starr testified in 2010. Lukehart asked why Starr was
5    being called a witness, to which Louie responded that he would "lay out of the
     details or the circumstances ... of the arrest." Lukehart recalled looking at Louie
6    and saying, "You've got to be kidding. What do you need that for?" Lukehart said
     he was "jerking" Louie's chain "a little bit" and said, "there's no good that can
7    come from this."[14] Rogers asked Lukehart why he had said "no good" could come
     from calling Starr. Lukehart responded by "claim[ing] the work-product
8    privilege." The court said that because Lukehart was claiming the privilege, the
     court would not "consider" Lukehart's statement to Louie that "no good" could
9    come from calling Starr.

10   Gagliardini asked Lukehart whether he recalled "any indication by the judge
     [Judge Brownlee] in chambers that quite possibly this was a bad idea on Mr.
11   Louie's part, calling this witness [Deputy Starr]?" Lukehart responded, "I have a
     vague impression of that. I can't recall exact words."
12
13   Bowman testified that at chambers conferences during the first trial, Judge
     Brownlee had issued five or six "warnings" to Louie. "Most" of the warnings
14   were relating to Louie violating issues addressed in Evidence Code section 402
     hearings. Some of the warnings were admonitions to Louie that he be "very
15   careful of what you do and what you say." Bowman recalled a specific in-
     chambers conference where Judge Brownlee told Louie, "[Y]ou can't continue to
16   do this." Louie responded, "Your Honor, I'm just trying to try my case."

17   Later, Bowman admitted he could not "sit here and tell you exactly what the
     warnings were prior to the mistrial."

18   Gagliardini called Louie as a witness. Louie testified he had practiced for
     approximately six and a half years before the mistrial occurred. Louie had tried
19   between 10 and 30 felony cases that went to verdict before the mistrial occurred.[15]
     Louie "believe[d]" none of those cases ended in a mistrial based on his failure to
20   advise a witness of an in limine motion. Louie testified he understood what an in
     limine ruling was and that he had an important obligation to relate relevant in
21   limine rulings to witnesses.

22   Louie had police officers testify as witnesses more than 100 times. In his
     experience, police officers would sometimes volunteer information during
23   Louie's questioning.

24   Cindy Zimmer was Louie's supervisor at the district attorney's office. Gagliardini
     showed Louie an e-mail from Zimmer to "Larry" dated April 17, 2008. Louie
25   testified that he believed Larry was the district attorney's chief investigator at the
     time. In the e-mail, Zimmer says "Ms. Tameka Turner is a material witness in this
26

27   ──────────────────────
     [14] Louie did not recall Lukehart saying that.
28   [15] Louie had also completed "maybe" five to 15 misdemeanor trials before the mistrial in the present case.

case.... Her testimony is crucial in order for the prosecution to prevail."[16] Louie testified that even having seen this e-mail, he believed Turner was not important to his case-in-chief when the jury was sworn in for the first trial in this case. Louie believed Zimmer sent the e-mail before the district attorney's office received the DNA analysis. Louie conceded Turner was "critical" to "catch[ing]" defendants after they committed the 2007 robbery. However, as for the subsequent prosecution of the defendants, Turner was important but not necessary. Louie testified that if Turner had been indispensable to his case, he would not have sworn in a jury. Instead, he would have talked to his superiors about dismissing and refiling the case.

However, Louie conceded that he did not have another witness under subpoena who could testify as to how she received the items recovered from the residence in Palmdale. Louie did not have any other available witnesses to testify as to how those items were handled prior to their seizure by law enforcement. However, that fact did not cause Louie concerns as to how he would address the issue of DNA transfer.

Louie did not remember Judge Brownlee ever telling him to "knock it off" during a chambers conference. Nor did Louie recall Judge Brownlee ever warning him that he had violated a court order or in limine ruling.

Louie testified that as of the morning Deputy Starr testified, he had Turner under a subpoena to testify at trial. However, Louie did not know where Turner was located, and was not aware of whether or not law enforcement was actively seeking to enforce the bench warrant against her.

Louie knew Deputy Starr was in the SWAT vehicle when the stop occurred, and that the SWAT vehicle was a "big issue" in the case. Louie did not "prep" or interview Deputy Starr before he testified. However, Louie "believe[d]" he "made contact with him outside of the courtroom" immediately before he testified.[17] However, Louie failed to advise Starr of the in limine ruling, which he said was an "oversight."

Louie intended to elicit specific information from Deputy Starr: that he observed two males exit the blue Camry. Louie did not intend to elicit information from Starr as to the second vehicle that law enforcement had stopped that day. Louie did not "believe" that he intended to elicit the identity of the two individuals from Starr.

Louie made a "deliberate point" in choosing his questions to avoid eliciting information concerning the SWAT team, spike strips, etc. When Louie asked whether Deputy Starr made contact with the Camry, and Starr replied he was in the turret position of the armored personnel vehicle, Louie was "shocked" because he anticipated the question would elicit a simple "no" response.

Gagliardini asked Louie why he continued to question Deputy Starr after obtaining his testimony about the two males exiting the Camry. Louie disagreed, saying that he did not think he asked any questions outside of what he had told Judge Brownlee he would ask. Louie acknowledged that Starr's testimony violated the in limine order.

---

[16] Simson requested that Zimmer's e-mail only be admitted for the limited purpose of its effect on the hearer and not for the truth of the matters asserted. The court granted the request.

[17] Later, however, Louie said he did not recall specifically having a conversation with Deputy Starr.

At the time of the mistrial, Louie had not yet introduced his DNA evidence.[18] However, the evidence had been "cleared" for Louie to "bring it in." At no point during the trial did Louie feel that he was in danger of losing. When asked why he thought he was going to win the case, Louie testified:

> "Because I had won all of the evidentiary motions: The DNA was coming in, the wiretap evidence was coming up, the gang evidence was coming in, the fingerprint evidence was coming in. [¶] I had all my victims, witnesses lined up. [¶] I had them on video. [¶] I had – one of their fingerprints was on the getaway car. I had – one of their fingerprints was on the money bag. [¶] Their DNA was all over the clothing and the money bags and the money strips from the robbery. [¶] They were on video. When they came back months later, they had – I believe there was one of the same – same assault weapons was in the vehicle with the sawed-off butt stock that was shown in the video when they robbed the ... casino in 2007. [¶] So all my evidence was coming in. My case was going well. I had the victims testify. I played the video. And it seemed like a straightforward case to me at that point."

When the court granted the mistrial, Louie was upset and disappointed – he disagreed with the court's ruling.

During the first trial, Louie felt overmatched because there were four defense lawyers against a single prosecutor.

Judge Brehmer took judicial notice of the entire record and reviewed the same.

***Trial Court's Ruling***

On October 5, 2016, Judge Brehmer filed his written ruling. The court determined that the evidence supported only the following reasonable inferences: that Louie was not worried about his ability to prevail without Turner's testimony; that Louie's questioning of Investigator Sproles was not done to elicit inadmissible evidence; and that Louie did not goad the defense into requesting a mistrial based on the unsolicited, volunteered, and nonresponsive testimony of Deputy Starr. Accordingly, the trial court struck defendants' pleas of once in jeopardy and reinstated their convictions (except count 22).

Bell II, 47 Cal. App. 5th at 159–77 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

---

[18] Louie said the DNA and gang evidence was "coming in." He then said, "I think most of it had already c[o]me in up to the point of the mistrial." He then corrected himself that the DNA evidence had not yet been introduced, but that it had been "cleared" by the court to "come in."

or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Davis v. Ayala</u>, 576 U.S. 257, 268–69 (2015); <u>Harrington v. Richter</u>, 562 U.S. 86, 97–98 (2011); <u>Williams</u>, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. <u>Ayala</u>, 576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. <u>Cone v. Bell</u>, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. <u>Moses v. Payne</u>, 555 F.3d 742,

754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. Generally, federal courts "look through" unexplained decisions and review "the last related state-court decision that does provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

1   "When a federal claim has been presented to a state court[,] the state court has denied

2   relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

3   the state court adjudicated the claim on the merits in the absence of any indication or state-law

4   procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a

5   decision on the merits and there is no reasoned lower-court opinion, a federal court

6   independently reviews the record to determine whether habeas corpus relief is available under

7   § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

8   record is not *de novo* review of the constitutional issue, but rather, the only method by which we

9   can determine whether a silent state court decision is objectively unreasonable." Himes v.

10  Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

11  record and "must determine what arguments or theories . . . could have supported, the state

12  court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

13  those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

14  Court." Richter, 562 U.S. at 102.

15                                              **IV.**

16                                        **DISCUSSION**

17          In his sole claim for relief, Petitioner asserts that the "trial court erred by granting the

18  motion to strike the defendants' plea of once in jeopardy because the underlying facts were

19  disputed and more than one inference could be drawn from those facts which were undisputed."

20  (ECF No. 1 at 4.[19]) Respondent argues that the state court reasonably denied this claim. (ECF

21  No. 14 at 16–23.) This claim was raised on direct appeal in the California Court of Appeal, Fifth

22  Appellate District, which denied the claim in a reasoned decision. The claim was also raised in

23  the petition for review, which the California Supreme Court summarily denied. As federal courts

24  "look through" summary denials and review "the last related state-court decision that does

25  provide a relevant rationale," Wilson, 138 S. Ct. at 1192, this Court will examine the decision of

26  the California Court of Appeal.

27  ─────────────────────────────

28  [19] Page numbers refer to the ECF page numbers stamped at the top of the page.

1

## A.  Last Reasoned Decision

2

In denying Petitioner's claim challenging the strike of his jeopardy plea, the California

3

Court of Appeal stated:

4

### I. The Motion To Strike Defendants' Jeopardy Plea Was Properly Granted

5

6

7

A defendant may enter one or more of several pleas to an indictment or information. A general plea, such as the plea of not guilty, "puts in issue every material allegation of the accusatory pleading."[20] (§ 1019.) In contrast, special pleas like once in jeopardy or insanity "alleg[e] one or more new facts rather than merely disputing the legal grounds of the action or charge." (Black's Law Dict. (11th ed. 2019) p. 1394, col. 1.)

8

9

10

11

12

13

14

15

16

17

18

There are several important differences between a general plea of not guilty and the special pleas. Importantly, a plea of not guilty invokes the "constitutionally rooted presumption of innocence." (*Cool v. United States* (1972) 409 U.S. 100, 104, 93 S.Ct. 354, 34 L.Ed.2d 335; see *Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 603, 119 Cal.Rptr. 302, 531 P.2d 1086; see also § 1096.) In contrast, special pleas raise separate issues to which the presumption of innocence does not apply. (*People v. Severance* (2006) 138 Cal.App.4th 305, 315, 41 Cal.Rptr.3d 397; see also *People v. Newell* (1923) 192 Cal. 659, 667, 221 P. 622 (*Newell*).) This fact, in turn, has several consequences unique to special pleas. First, without the benefit of a presumption in his or her favor, the defendant bears the burden of proving the specially pleaded defense at trial. (*People v. Severance*, *supra*, at p. 315, 41 Cal.Rptr.3d 397). Second, in limited circumstances, a court may remove the issues raised by a defendant's special plea from the jury's consideration when it lacks sufficient evidentiary support. (*Ibid.*; see also *Newell*, *supra*, at p. 667, 221 P. 622.) The court's power in this regard is limited, as reflected in sections 1041 and 1042. Those statutes provide that jeopardy and insanity pleas generally raise issues of fact (§ 1041) and issues of fact must be tried to a jury (§ 1042).[21] However, when the jeopardy plea is not supported by evidence, there is – by definition – no issue of fact for a jury, only "a question of law ... presented to the trial court." (*Newell*, *supra*, 192 Cal. at p. 668, 221 P. 622; see also *Mason*, *supra*, 200 Cal.App.2d at p. 285, 19 Cal.Rptr. 240.)

19

20

21

22

23

If the lack of evidence supporting the special plea becomes evident at trial, the court may instruct the jury to find against the defendant on the special plea. (*Newell*, *supra*, 192 Cal. at p. 668, 221 P. 622; *People v. Cummings* (1899) 123 Cal. 269, 272–273, 55 P. 898; see also *People v. Ceja* (2003) 106 Cal.App.4th 1071, 1083–1084, 131 Cal.Rptr.2d 601.) However, the court need not wait until trial to remove the issue from the jury's consideration. The prosecution may move to strike the defendant's jeopardy plea before trial.[22] (*Mason*, *supra*, 200 Cal.App.2d at p. 285, 19 Cal.Rptr. 240; see also *People v. Hernandez* (2000) 22

24

25

26

27

28

---

[20] Except allegations regarding previous convictions to which an answer is required by section 1025. (§ 1019.) Nor may a defendant assert jeopardy or insanity defenses on a plea of not guilty. (§ 1020.)

[21] The plea of not guilty also generally raises issues of fact. (§ 1041.) But that plea must *always* be tried to a jury (unless waived) under the impartial jury clause of the Sixth Amendment. (U.S. Const., 6th Amend. ["In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury..."].)

[22] Defendants do not challenge the long established law permitting motions to strike pleas, but instead argue that the motion to strike in this case should have been denied on the merits.

Cal.4th 512, 528, 93 Cal.Rptr.2d 509, 994 P.2d 354 (conc. opn. of Brown, J.).) In either circumstance, the standard for removing the issue from the jury is whether " ' "the evidence is uncontradicted or leads to a single conclusion." ' "[23] (*People v. Ceja*, *supra*, at pp. 1083–1084, 131 Cal.Rptr.2d 601; see also *People v. Vigghiany* (1960) 181 Cal.App.2d 621, 631, 5 Cal.Rptr. 501.)

On a motion to strike the jeopardy plea, the defendant bears the burden of evidentiary production. (See *Mason*, *supra*, 200 Cal.App.2d at p. 285, 19 Cal.Rptr. 240.) To carry that burden, defendants must adduce evidence that would support a jury finding in their favor. In other words, evidence that would withstand substantial evidence review from an appellate court. (See *People v. Severance*, *supra*, 138 Cal.App.4th at p. 316, 41 Cal.Rptr.3d 397.) Under that standard, it is not enough to merely produce some evidence on the issue. (*People v. Olmsted* (2000) 84 Cal.App.4th 270, 277, 100 Cal.Rptr.2d 755 [substantial evidence is not synonymous with "any" evidence].) The evidence must be reasonable, credible, and of solid value; " ' "it must actually be 'substantial' proof of the essentials which the law requires in a particular case." ' " (*Ibid.*)

If the defendant bears this burden, the motion to strike must be denied even if the prosecution adduces evidence supporting a contrary inference. In light of the defendant's showing, such prosecution evidence would only confirm that there is an issue of fact (§ 1041) to be resolved by a jury. If, however, the defendant fails to carry this burden, then there is – by definition – no issue of fact for the jury to resolve. The court may resolve the question of law presented by the motion to strike.[24]

Here, the court concluded there was no issue of fact. We consider the issue de novo.

### *Evidence and Inferences*

Before we turn to the evidence, it is important to briefly discuss how it is determined whether evidence "raises" or "supports" a particular inference. That determination is the linchpin of this case.

Fundamentally, whether evidence "raises" or "supports" a particular inference is a matter of probability. Relevant evidence increases the apparent probability a particular fact is true. Some evidence increases that apparent probability greatly, and other evidence does so slightly. There is a point on this spectrum above which the probabilistic connections between the evidence and proposed inference are deemed "reasonable" and below which weaker probabilistic connections are deemed "speculation" or "conjecture." (Evid. Code, § 600, subd. (b) [an inference is a deduction of fact that may logically and "reasonably" be drawn from another fact].) In this way, the law distinguishes between facts that can "logically and reasonably be drawn" from the evidence (*ibid.*) versus evidence which "merely

---

[23] Only issues of fact must be tried to a jury under section 1042. If the state of the evidence satisfies the test described here, then there is no issue of fact.

[24] Bell argues a motion to strike presents a question of fact for the trial court. Not so. The ultimate question of the prosecutor's intent is usually a question of fact. However, whether particular evidence is *sufficient to raise an inference* of wrongful prosecutorial intent is a question of law. In other words, whether a particular inference *can* be drawn from certain evidence is a question of law, but which inference out of several *should* be drawn is a question of fact. (*De Loss v. Lewis* (1947) 78 Cal.App.2d 223, 225, 177 P.2d 589.) A motion to strike in this context presents the former question to the court, not the latter.

raises a possibility" a particular fact is true. (*People v. Redmond* (1969) 71 Cal.2d 745, 755, 79 Cal.Rptr. 529, 457 P.2d 321.) The former is called a reasonable inference; the latter is called speculation and is "not a sufficient basis for an inference of fact." (*Ibid.*) At the margins, it can be difficult to demarcate between the two. However, case law has created a kind of scatterplot diagram showing where the line has been drawn in other cases.

Hypotheticals help illustrate. Imagine a defendant is found with a bloody knife standing over the body of someone who has been stabbed to death. This set of circumstances significantly increases the apparent probability the defendant killed the person. That is not to say it proves guilt to a certainty. It remains entirely possible that the defendant may have merely come upon the stabbed body and removed the knife to render aid. That is why juries are generally free to reject inferences even if they are supported by the evidence. Nonetheless, the observed circumstances (i.e., the evidence) sufficiently increases the apparent probability that defendant was the killer (i.e., the inference) that we would say the evidence "supports" the inference of guilt.

However, other circumstantial evidence only *slightly* increases the apparent probability a particular fact is true. For example, consider evidence that a defendant was in the same city where a murder occurred. Certainly, the apparent probability of defendant's involvement is slightly higher if he was in the same city where the crime occurred than if he was in another state. But at most, we could say such evidence is "not inconsistent with" the defendant having committed the murder.[25] (See *People v. Blackwell* (1961) 193 Cal.App.2d 420, 424, 14 Cal.Rptr. 224 [opportunity to commit crime, alone, provides only a conjectural connection to the inference of guilt].) We would not say this evidence "supports" an inference the defendant committed the murder. Similarly, the fact a defendant was seen with the killer before and after the murder is insufficient to raise an inference the defendant was involved in the murder. (*People v. Reyes* (1974) 12 Cal.3d 486, 500, 116 Cal.Rptr. 217, 526 P.2d 225.)

Now we bring these principles to our present context. The question on a motion to strike a jeopardy plea is whether "different inferences" can be drawn from the evidence. (*Mason*, *supra*, 200 Cal.App.2d at p. 285, 19 Cal.Rptr. 240.) If the evidence supports only the inference contrary to defendant's plea (or supports no inferences on the issue of jeopardy), then the plea lacks evidentiary support and will be stricken. Here, the inference defendants needed to support with evidence was that Louie either "intended to 'goad' the defendant into moving for a mistrial" (*Oregon v. Kennedy*, *supra*, 456 U.S. at p. 676, 102 S.Ct. 2083), or intentionally committed misconduct that successfully thwarted a likely acquittal (*People v. Batts* (2003) 30 Cal.4th 660, 666, 134 Cal.Rptr.2d 67, 68 P.3d 357 (*Batts*).)[26] We will refer to these two intents collectively as "wrongful prosecutorial intent" or "wrongful intent."

Given the principles set forth above, defendants cannot prevail merely because they present some evidence at the motion to strike hearing. Defendants must do

---

[25] For this reason, it would clear the low bar of relevance. To be legally "relevant" evidence need only have *any* tendency in reason to prove or disprove a material disputed fact. (Evid. Code, § 210.)

[26] This latter standard is "stringent, because the normal and usually sufficient remedy for the vast majority of instances of prejudicial prosecutorial misconduct that occur at trial is provided under the federal and state *due process* clause, and calls for either a declaration of mistrial followed by retrial, or a reversal of a defendant's conviction on appeal followed by retrial." (*Batts*, *supra*, 30 Cal.4th at p. 666, 134 Cal.Rptr.2d 67, 68 P.3d 357.)

more than "merely raise[ ] a possibility" (*People v. Redmond*, *supra*, 71 Cal.2d at p. 755, 79 Cal.Rptr. 529, 457 P.2d 321) the prosecutor had wrongful intent. Instead, defendants must produce evidence from which a deduction of wrongful prosecutorial intent can "logically and reasonably be drawn." (Evid. Code, § 600, subd. (b).)

As explained further below, we conclude the evidence here does not support "different inferences." (*Mason*, *supra*, 200 Cal.App.2d at p. 285, 19 Cal.Rptr. 240.) Rather, the evidence supports a single inference: that Louie did not intentionally goad the defendants into requesting a mistrial, nor intentionally commit misconduct to avoid an acquittal. Defendants do point to some evidence that is "not inconsistent" with wrongful prosecutorial intent. But none of that evidence rises to the level of *supporting an inference* Louie in fact acted with the requisite intent. Therefore, we will affirm the court's order striking defendants' pleas.

### The Evidence Raises a Strong Inference That Louie Did Not Act with Wrongful Intent

Plenty of evidence supports the Attorney General's urged inference: that Louie did not act with wrongful intent.

First, Louie himself – an officer of the court – directly and unequivocally testified under oath that the failure to advise Deputy Starr of the in limine ruling was an "oversight," and he did not intend to cause a mistrial. Before trial began in 2010, Judge Brownlee remarked, "Mr. Louie has been in this court more than any other attorney in the last 12 months, and I found him to be a man of his word in motions in limine." Louie's unequivocal testimony under oath strongly supports the inference that Louie did not act with wrongful intent.

Second, the circumstances of Deputy Starr's testimony strongly indicate that Louie did not intend to cause a mistrial. Louie asked Starr: "Did you make – did you end up making contact with that vehicle [i.e., the Camry]?" This question does not seek testimony about the law enforcement resources deployed at the scene. Yet, in his response, Starr volunteered that he was "positioned in the turret of the armored personnel carrier" at the time. Judge Brownlee himself observed that it was "obvious ... that Mr. Louie realized when Deputy Starr made reference to the armored personnel [carrier] he had made an error." These circumstances support the inference that Louie did not intend to elicit the testimony.[27]

### The Evidence Does Not Support an Inference Louie Acted with Wrongful Intent

Of course, the mere fact that there is evidence supporting the prosecution's urged inference is not dispositive on a motion to strike. If there is also evidence supporting the inference of wrongful prosecutorial intent, then the motion to strike

---

[27] Lewis describes Louie's question as asking Deputy Starr "what he could see." Bell similarly argues Louie's question was a " 'what did you see' question[ ]" and, therefore, it is foreseeable Starr would respond by describing his vantage point. First, we disagree that a question asking what a witness saw calls for a description of their vantage point. Second, the question here did not ask what Starr saw, but instead whether he "made contact" with the "vehicle." The question was getting at whether Starr *interacted* with the two men in the vehicle, not where he was when the two men were arrested.

Joseph calls Louie's question "open-ended." We disagree. Asking Deputy Starr if he "made contact" with the individuals in the Camry is not open-ended, in our view.

should have been denied. Defendants argue such evidence is present here. We disagree.

### *Turner's Absence and Related Issues*

Defendants emphasize the importance of Turner to Louie's case in various respects.[28] But her importance is not in dispute[29] – Louie acknowledged that Turner was important to his case and he would have liked to have her testify at trial.[30] Therefore, we need not examine in detail the basis for defendants' insistence that Turner was important – we grant the premise. The question then becomes whether the fact an admittedly important prosecution witness was missing gives rise to an inference the prosecutor subsequently harbored wrongful intent in his handling of another witness. That is, could one "logically and reasonably" deduce intent to goad a defense-requested mistrial from the fact that an important witness was missing. We think not. The most that can be said of such a circumstance is that it is "not inconsistent with" the speculative possibility the prosecutor harbored wrongful intent. Indeed, every time a prosecutor "loses" a witness, suffers an adverse ruling, or confronts any other type of setback, it could be said such circumstances are "not inconsistent with" the theoretical possibility he or she would later try to induce a mistrial.

But the evidence does not naturally *support* or *give rise to* an inference of such intent. That is, the absence of an important witness merely raises the possibility a prosecutor could act wrongfully to bolster his or her case or goad a mistrial. However, one would not "logically and reasonably" deduce (Evid. Code, § 600, subd. (b)) that a prosecutor acted wrongfully simply because an important, but unessential, witness was missing.

As defendants note, it is undisputed that Turner was the only witness under subpoena who could testify as to how she received the items recovered from the Palmdale residence, and how the items were handled prior seizure by law enforcement. But those facts are consistent with Turner being an important, but not essential, witness. As Williams concedes, "the items could be admitted

---

[28] For example, defendants argue Turner provided valuable testimony for the prosecution at the retrial. Defendants reference Turner's testimony about statements Bell made to her, things she overheard at the Palmdale residence, her observation of a red Pontiac Grand Am (or something like it) parked outside the Palmdale residence, the SKS rifle found in the garage closet, and the circumstances surrounding the bag that Bell told her to dispose of.
   Defendants also argue that the importance of Turner to the prosecution's case is evidenced by Louie's attempts to obtain her testimony in the first place and, after she could not be found, the lengths Louie went to to "compensate" for her testimony.

[29] Defendants point to language in the trial court's ruling suggesting it found Louie was not "concerned" with Turner's absence. And defendants argue there was evidence showing Louie was, in fact, "concerned" about Turner's absence. However, we review the court's ruling de novo, not its reasoning. We need not determine whether Louie's perspective on Turner's absence is best described as "concern." The undisputed testimony was that Louie viewed Turner as important to his case, but not indispensable.

[30] We agree there was evidence that Turner was important to the prosecution's case. We do not agree that there was evidence supporting an inference that Louie committed intentional misconduct because he believed Turner was essential to his case.
   Louie initially testified Turner was not important to his case-in-chief when the jury was impaneled. In subsequent testimony, Louie explained that Turner was *important* but not *essential* to his case. Louie also agreed that he did not have another witness under subpoena who could testify as to how Turner received the incriminating items recovered from the Palmdale residence. Nor did Louie have any other available witnesses to testify as to how those items were handled prior to their seizure by law enforcement.

without her testimony." Williams does insist that her testimony provided the "evidentiary connection" between the items and defendants. But, as explained below, the items could be connected to defendants even without Turner's testimony (although Turner's testimony would strengthen the connection).

One of the items found was a ripped casino money wrapper used by Golden West Casino (with the date of the robbery imprinted on it) *with Bell's fingerprint on it*. This ties Bell to the casino robbery apart from Turner's testimony. Defendants posit that without Turner's testimony, his "fingerprint could have been on the wrapper just because he was around the Palmdale house in the week following the casino robbery." But, again, this merely confirms that, at most, Turner's testimony would have been helpful to bolster the strength of the fingerprint evidence, but not essential. The fingerprint evidence was quite helpful to the prosecution evidence even without Turner's testimony. That is, a jury could have chosen to infer Bell's identity as one of the masked robbers from the fingerprint evidence – among other evidence – even without Turner's testimony. Relatedly, the clothing items and the DNA evidence they contained also connected defendants to the items – even apart from Turner's testimony – because they matched what the robbers were wearing in the surveillance video and *were recovered near the casino money wrapper tied to Bell.*

Defendants argue that the clothing was "only linked to the robbers by a generic description" (e.g., "a short-sleeved black shirt.") Moreover, the clothing may not have been put in the bag at the same time as the casino items, and the clothing may not have been worn by the casino robbers. But that does not eliminate the evidence's value to the prosecution. The clothing was found alongside a casino money wrapper with the date of the robbery imprinted on it. Add to that the fact the clothing did match the (admittedly generic) clothing worn by the casino robbers, and Louie could have quite reasonably concluded a jury would likely tie the clothing (and the DNA found thereon) to the casino robbers, without Turner's testimony.[31] Certainly, Turner's testimony would have strengthened Louie's case by eliminating some "benign" explanations for this evidence. And that is presumably why Louie wanted her to testify. But we are satisfied that the only reasonable inference is that Turner's testimony was not so essential as to raise an inference Louie intentionally caused a mistrial and then lied about doing so.[32]

---

[31] Defendants argue that Turner was "essential" to the prosecution's case as evidenced by the prosecutor's efforts to "work around the absence of Ms. Turner by allusion to other evidence that would normally require her testimony." For one, defendants point to Louie's question to Sproles about who was depicted in court exhibit No. 1. The court struck Sproles's response, which identified court exhibit No. 1 as depicting Tameka Turner. However, that identification had come in anyway when Patricia Steven testified that court exhibit No. 1 depicted her daughter, Tameka Turner.

Defendants argue that Louie's decision to call Steven was an attempted "work-around" to compensate for Turner's absence. But the fact that Louie could "work-around" Turner's absence in part by calling Steven to testify *supports* his claim that Turner was not absolutely essential to his case.

[32] Defendants argue the DNA evidence in the case was "problematic." They argue that analyzing DNA mixtures from multiple contributors involves mathematically complex calculations and can lead to different results even among trained professionals. But this line of attack on the DNA evidence is unaffected by Turner's testimony.

Moreover, defendants note there was always the possibility that some, or all, of the DNA found on the clothing was the result of transfer from one item to another (rather than merely from the wearer to the clothing). Certainly, the defense was free to elicit testimony to this effect and to argue to the jury accordingly. But this line of attack on the DNA evidence is not so powerful as to cause Louie to conclude his case was in such trouble that he should goad the defense into requesting a mistrial.

1

2

### *Additional Identity Evidence*

3

We also note that there was substantial identity evidence apart from the evidence found at Turner's residence.

4

The robbers arrived in a "small red car" at about 4:00 a.m. Shortly thereafter, law enforcement found an abandoned red Pontiac near the casino. Defendant Williams's fingerprint was found on the interior rearview mirror of the Pontiac.

5

6

In the surveillance video of the robbery, a voice is heard saying, "Gotti! Come on Gotti!"[33] The same voice then says, "Everybody down." "Gotti" is Bell's moniker.

7

8

The cashier's cage at the casino had two thin windows where chips were dispensed. Months after the first robbery of the casino, and hours before defendants intended to rob the same casino again, Lewis spoke to Williams in a wiretapped phone call. Lewis asked Williams how far "it" was. Williams replied, "The one. The same one," with two "little window[s]."

9

10

### *The Record Indicates Louie Could Have Dismissed and Refiled the Case After Learning of Turner's Absence, yet He Did Not Do So*

11

12

Moreover, the evidence about Turner going missing does not logically support a deduction of wrongful intent, because even if Louie had intended to delay trial, he had at his disposal a far simpler, and more ethical way to do so. It is clear from the record that at least by October 25 and 26, 2010, the prosecutor's office was having significant difficulty locating Turner and would therefore have known her presence at trial was not guaranteed. By October 27, Louie had made known to the court that he wanted a bench warrant issued for Turner. Louie testified that if Turner had been indispensable to his case, he would have simply talked to his superiors at the district attorney's office about dismissing and refiling the case.[34] (See *People v. Superior Court* (*Martinez*) (1993) 19 Cal.App.4th 738, 743–744, 23 Cal.Rptr.2d 733 [refiling of charges only prohibited by § 1387 if case is terminated by court order *twice*].) Yet, Louie did not dismiss the case before

13

14

15

16

17

18

19

[33] The surveillance video was a prosecution exhibit offered at the second trial.

20

Williams argues that the exhibits and testimony from the second trial were not "before" the court on the motion to strike hearing. We disagree. The court made clear it had taken judicial notice of the "entire court record" of the case and had reviewed the same. Indeed, the court said, "Obviously the Court has taken notice of the entire record. And I will tell everyone, I have read the entire record. Every word, every page."

21

Williams notes his request for judicial notice only sought the record of the first trial. Joseph's counsel also made an oral request for judicial notice pertaining to the first trial. However, Lewis requested judicial notice of "all trial transcripts" referenced in his opposition to the prosecution's motion to strike. And Lewis's opposition cited testimony Turner gave at the second trial. This bolsters the conclusion that the motion to strike court meant what it said; that it had taken judicial notice of the *entire* record, including the first *and second* trials.

22

23

24

Finally, we note that the same judge – Judge Brehmer – presided over the second trial and the motion to strike. Judge Brehmer expressly relied on his knowledge of Turner's testimony at the second trial as grounds to decline receiving testimony from Investigator Sproles. We conclude the record of the second trial was properly "before" the motion to strike court.

25

26

[34] Defendants acknowledge this testimony, but argue: "However, Louie also testified he did not know whether he had the authority to dismiss the case but could make a recommendation; he never tried to find out." But, if true, the fact that Louie did not even try to find out if he could dismiss and refile arguably *strengthens* the claim that he did not view Turner's testimony as essential.

27

28

27

jurors were sworn in on the afternoon of October 28.[35] This evidence strongly supports the inference that he did not feel the need to delay trial to locate Turner.[36]

Defendants respond that dismissing and refiling was "a more perilous approach to take, since Turner might never show up...."[37] But that point cuts against the theory of intentional goading as well. Why would Louie have intentionally goaded a mistrial when he had no reason to know whether Turner would ever be found and therefore no reason to know he would have a better chance of prevailing at a retrial? (See *U.S. v. Lun* (9th Cir. 1991) 944 F.2d 642, 645.)

### *Prosecutor's Response to Mistrial Motion*

Additionally, Louie strongly opposed the defense's motion for a mistrial. This further supports the inference that Louie did not goad the defense into requesting the mistrial. (See *U.S. v. Mata* (11th Cir. 2009) 311 Fed.Appx. 280, 284; *U.S. v. Whitehead* (5th Cir. 2007) 257 Fed.Appx. 777, 782; *U.S. v. Shelley* (11th Cir. 2005) 405 F.3d 1195, 1201; *U.S. v. McIntosh* (1st Cir. 2004) 380 F.3d 548, 557.)

Louie also testified at the motion to strike hearing that he did not want a mistrial. Bell responds:

> "The prosecutor's hindsight testimony that he did not really want a mistrial is a little too convenient, and could easily be disregarded by a jury. For these reasons the ultimate fact in the double jeopardy argument – the prosecutor's motivation – was disputed, and the evidence is subject to varying interpretations."

But merely pointing to an item of prosecution evidence and saying it lacks credibility or does not inexorably compel a particular inference is not the same as proving that a contrary inference is supported by the evidence. That is, merely speculating that Louie's testimony could be untruthful is not the same as adducing evidence tending to show it was untruthful.

---

[35] Defendants argue this was "very little time to consider what to do," in light of Louie's lack of personal authority to dismiss the case, and the progress of jury voir dire.
The last contact the district attorney's investigator had with Turner was on October 14. By October 25 and 26, the investigator was going to considerable lengths to find Turner – going to Turner's residence, place of work, and her daughter's school. Thus, there is ample reason to believe Louie knew Turner was unlikely to testify at trial *days* before the jury was sworn on October 28.
Moreover, defendants' argument is simply that this particular prosecution evidence (i.e., Louie's testimony about the possibility of dismissing and refiling) is not as strong as the Attorney General would have us believe. This is no substitute for adducing evidence affirmatively supporting defendants' own urged inference that Louie acted with wrongful intent.

[36] Defendants say the option of dismissing and refiling does not preclude the possibility Louie was worried about Turner's "absence." Again, there is no dispute that Louie preferred that Turner testify. But the question is whether Louie viewed her as so essential that her absence warranted the purposeful commission of misconduct. The dismissal/refiling option reinforces Louie's claim that at the beginning of trial, he did not view Turner's testimony as absolutely essential.
And even if we accepted defendants' argument that this evidence does not strongly support the inference urged by the Attorney General, it would not mean the inverse is true – that the evidence supports the contrary inference urged by the defense.

[37] Defendants also suggest Louie might have had to "release" defendants in the meantime. But if Louie dismissed and refiled immediately, defendants would presumably not have been released in the interim. While an immediate refiling would start certain deadlines ticking down, it would have given the prosecution at least some additional time to try to find Turner.

In a similar vein, defendants argue: "It is also said to be "undisputed" that the prosecutor apologized and offered to accept personal punishment in lieu of a mistrial. [Citation.] This is literally accurate but various conclusions could be drawn; it cannot be assumed that the prosecutor was not being disingenuous. The issue is for a jury." Given the defense's burden of evidentiary production, it is more important to note that it cannot be assumed the prosecutor *was* being disingenuous. Defendants needed to adduce evidence raising an inference of disinguity, not merely observe that it is theoretically possible for witnesses to lie.

### *Other Issues*

Defendants complain that the court did not find whether Lukehart's testimony was truthful or not. But that was not the court's role. The question is whether Lukehart's testimony – or any other evidence – raised an inference of wrongful prosecutorial intent. Lukehart testified that his comment to Louie that "no good" could come from calling Deputy Starr was made to "jerk[ ]" Louie's chain "a little bit." Lukehart's comment to Louie simply does not raise an inference that Louie *intentionally* failed to apprise the witness of the in limine order. Moreover, the court ruled that because Lukehart invoked work product privilege in declining to answer why he made this statement to Louie, the court ruled it would not "consider" Lukehart's statement.[38]

Defendants also argue the lower court improperly considered the state of mind of defense counsel, among other purported errors in the trial court's ruling. However, we are evaluating the propriety of granting the motion to strike de novo. We review the court's ultimate ruling, not its reasoning.

Defendants say there was evidence Louie engaged in an "intentional pattern of conduct, rather than making a one-off mistake." For example, defendants cite a statement the court made concerning DNA discovery: "[W]e've been at this for a week and a half, and we're still at it, and little by little almost every other day or every day there's a piece of evidence or piece of documentation or some sort of 1054 problem that hasn't been provided that is now being provided." But defendants fail to explain precisely how pretrial discovery delays could evince an intent to goad defendants into requesting a mistrial. Nor do defendants suggest that Louie failed to eventually provide any DNA evidence he was required to turn over.

Defendants also point to Louie's questions asking Investigator Sproles to identify court exhibit No. 1. They also point to Sproles's answer to another question where he said he had not met with Turner at the Palmdale residence – purportedly implying he had met her elsewhere. This, defendants contend, went beyond Louie's proffer to the court before Sproles testified that he was only going to ask about meeting Patricia Steven and how long Sproles was with her. Louie explained at the motion to strike hearing that when he makes a proffer of anticipated testimony, he "expect[s] some leeway" in asking related questions. Louie further explained he did not see anything wrong with asking Sproles about the court exhibit because Patricia Steven had already identified it as depicting Tameka Turner. Moreover, after Sproles testified, the defense moved to strike all

---

[38] Williams's opening brief argues this ruling was error because no context was needed. The brief cites no objection made in the lower court on this point, nor any legal authority in support of this claim.

his testimony. The court denied the motion and said, "Mr. Louie, I would hope that when you have another witness up here – *not that you did that with Mr. Sproles*, but that there's been many times when we have a witness up here, both the prosecution and the defense have come very close to skirting or going over the line on previous rulings." (Italics added.) This incident simply does not give rise to an inference of intent to goad a mistrial or thwart an acquittal.[39]

### *Evidentiary Burden*

After reading this opinion, defendants may be left thinking that it is very difficult to satisfy the burden of producing sufficient evidence of the prosecutor's intent. Indeed, it is. (*People v. Dawson* (1986) 154 Mich.App. 260, 270, 397 N.W.2d 277 [Kennedy's [State v. Kennedy (1983) 293 Ore. 260 [648 P.2d 360]] subjective intent standard "places upon the defendant the near impossible burden of proving the prosecutor's intent"].) For one, adducing evidence of intent is always difficult. Moreover, the fact remains that most prosecutors perform their duties ethically, even in the face of setbacks. Accordingly, it is difficult to produce evidence from which one could "logically and reasonably" deduce (Evid. Code, § 600, subd. (b))) that a prosecutor would act so improperly. In many cases, it is difficult to produce evidence of prosecutorial goading because no such goading occurred.

Of course, sometimes prosecutors do intentionally commit misconduct. But we see no basis to infer that is what occurred here. We note there are plenty of hypothetical examples of evidence that might have raised an inference that Louie had acted intentionally. For example, if Deputy Starr had testified that Louie directed or encouraged him to say something violative of the court's order. (See, e.g., *Batts*, *supra*, 30 Cal.4th at p. 671, 134 Cal.Rptr.2d 67, 68 P.3d 357.)[40] Or, if Louie's questions to Deputy Starr had been "egregiously improper," it could have raised an inference he "engaged in conduct which he knew to be improper." (*People v. Dawson*, *supra*, 154 Mich.App. at p. 273, 397 N.W.2d 277.) Or, of course, if Louie's mistrial-inducing misconduct had actually been intentional and he acknowledged as much. (E.g., *Lopez-Avila*, *supra*, 678 F.3d at p. 961.)[41] No such evidence was produced here.

We conclude that a deduction of wrongful prosecutorial intent cannot "logically and reasonably be drawn" (Evid. Code, § 600, subd. (b)) from the facts and

---

[39] Additionally, defendants cite Bowman's 2016 testimony that during chambers conferences interspersed with the first trial, Judge Brownlee had issued five or six "warnings" to Louie. Later, Bowman admitted he could not "sit here and tell you exactly what the warnings were prior to the mistrial." To the extent defendants are suggesting that there are additional, unspecified instances of misconduct that prompted "warnings," the lack of explanation as to the precipitating misconduct renders these warnings insufficient to raise an inference of wrongful prosecutorial intent.

[40] It is true that *Batts* concluded the prosecutor's actions in that case survived the *Oregon v. Kennedy* standard because while the misconduct was intentional and indefensible, it was not done to provoke a mistrial. (*Batts*, *supra*, 30 Cal.4th at pp. 667, 696, 134 Cal.Rptr.2d 67, 68 P.3d 357.) A similar result was reached in *U.S. v. Lopez-Avila* (9th Cir. 2012) 678 F.3d 955, 962–963 (*Lopez-Avila*). We cite *Batts* and *Lopez-Avila* here merely as examples of the type of evidence that can raise an inference the prosecutor's violation of a court order was nonaccidental. Separate evidence might be needed to show the prosecutor's nonaccidental misconduct was *specifically intended* to provoke a mistrial. It is this latter type of evidence that was found lacking in *Batts*.

[41] These examples are not an exhaustive list of the types of evidence that would support an inference of intent.

1  evidence cited by defendants. For that reason, we affirm the order striking
2  defendants' jeopardy pleas.

3  Bell II, 47 Cal. App. 5th at 178–90 (footnotes in original).

4      **B. Analysis**

5          The Double Jeopardy Clause of the Fifth Amendment[42] protects a
   criminal defendant from repeated prosecutions for the same
6  offense. As a part of this protection against multiple prosecutions,
   the Double Jeopardy Clause affords a criminal defendant a "valued
7  right to have his trial completed by a particular tribunal." The
   Double Jeopardy Clause, however, does not offer a guarantee to
8  the defendant that the State will vindicate its societal interest in the
   enforcement of the criminal laws in one proceeding.

10  Oregon v. Kennedy, 456 U.S. 667, 671–72 (1982) (citations omitted) (footnote in original).

11      "The Supreme Court has developed dual doctrines for assessing whether the Double

12  Jeopardy Clause bars retrial after the declaration of a mistrial." United States v. Mondragon, 741

13  F.3d 1010, 1013 (9th Cir. 2013). "Where the trial is terminated over the objection of the

14  defendant, the classical test for lifting the double jeopardy bar to a second trial is the "manifest

15  necessity" standard . . . ." Kennedy, 456 U.S. at 672. "But in the case of a mistrial declared at the

16  behest of the defendant, quite different principles come into play." Id.

17      Because "[a] defendant's motion for a mistrial constitutes a
   deliberate election on his part to forgo his valued right to have his
18  guilt or innocence determined before the first trier of fact," the
   Double Jeopardy Clause usually does not bar retrial when a
19  mistrial is declared with the consent of the defendant. Instead,
   "[o]nly where the governmental conduct in question is intended to
20  'goad' the defendant into moving for a mistrial may a defendant
   raise the bar of double jeopardy to a second trial after having
21  succeeded in aborting the first on his own motion."

22  United States v. Lopez-Avila, 678 F.3d 955, 962 (9th Cir. 2012) (quoting Kennedy, 456 U.S. at

23  676). "[T]he circumstances under which such a defendant may invoke the bar of double jeopardy

24  in a second effort to try him are limited to those cases in which the conduct giving rise to the

25  successful motion for a mistrial was intended to provoke the defendant into moving for a

26  mistrial." Kennedy, 456 U.S. at 679. "Prosecutorial conduct that might be viewed as harassment

27
28  [42] This Court held in *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), that this
   Clause was made applicable to the States through the Due Process Clause of the Fourteenth Amendment.

1   or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not

2   bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the

3   Double Jeopardy Clause." Id. at 675–76.

4        "[T]he 'goading' doctrine is a '*narrow* exception,'" Mondragon, 741 F.3d at 1014

5   (quoting Kennedy, 456 U.S. at 673), and "[i]n practice, the Kennedy standard is rarely met,"

6   Lopez-Avila, 678 F.3d at 962. Forty years after Kennedy, the Ninth Circuit noted that the

7   defendant in Lopez-Avila did not cite any "published Ninth Circuit case since Kennedy that has

8   held that retrial was barred after the defense consented to a mistrial motion. Nationwide, such

9   cases are few and far between." Lopez-Avila, 678 F.3d at 962.

10       Additionally, in Kennedy, the Supreme Court deferred to the findings of the state courts,

11  concluding: "Since the Oregon trial court found, and the Oregon Court of Appeals accepted, that

12  the prosecutorial conduct culminating in the termination of the first trial in this case was not so

13  intended by the prosecutor, that is the end of the matter for purposes of the Double Jeopardy

14  Clause of the Fifth Amendment to the United States Constitution." Kennedy, 456 U.S. at 679.

15  Similarly, here, the state court concluded that a deduction of wrongful prosecutorial intent to

16  goad the defense into moving for mistrial could not logically and reasonably be drawn from the

17  record given that the prosecutor testified under oath that his failure to advise Deputy Starr of the

18  in limine ruling was an oversight and he did not intend to cause a mistrial, the circumstances of

19  Deputy Starr's testimony strongly indicated that the prosecutor did not intend to cause a mistrial,

20  the other evidence adduced at trial and the prosecutor's actions regarding Turner going missing

21  showed that Turner's testimony was important but not absolutely essential, and the prosecutor

22  strongly opposed the motion for mistrial. "[T]hat is the end of the matter for purposes of the

23  Double Jeopardy Clause," Kennedy, 456 U.S. at 679, and Petitioner has not demonstrated that

24  "no 'fairminded juris[t]' could have reached the same judgment as the state court," Shinn v.

25  Ramirez, 596 U.S. 366, 378 (2022) (alteration in original) (quoting Harrington, 562 U.S. at 102).

26       The Court finds that the state court's denial of Petitioner's claim challenging the striking

27  of the jeopardy plea was not contrary to, or an unreasonable application of, clearly established

28  federal law, nor was it based on an unreasonable determination of fact. The decision was not "so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

**V.**

**RECOMMENDATION**

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 6, 2024**                    /s/ _Erica P. Grosjean_

UNITED STATES MAGISTRATE JUDGE